# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

## No. ACM 40066 (f rev)

————————————

### UNITED STATES
*Appellee*

**v.**

### Allan L. BROWN
Cadet, U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

*Upon Further Review*

Decided 9 December 2022

————————————

*Military Judge:* Jefferson B. Brown (arraignment and pretrial motions); Charles G. Warren.

*Sentence:* Sentence adjudged on 16 October 2020 by GCM convened at United States Air Force Academy, Colorado. Sentence entered by military judge on 19 November 2020: Dismissal.

*For Appellant:* Major Sara J. Hickmon, USAF; Captain Samantha P. Golseth, USAF; Sarah Urie (legal extern).[1]

*For Appellee:* Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Major Peter F. Kellett, USAF; Major John P. Patera, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, KEY, and GRUEN, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge KEY and Judge GRUEN joined.

————————————

[1] Ms. Urie served as a law student extern and was at all times supervised by attorneys in accordance with Rule 14.1(c) of this court's Rules of Practice and Procedure.

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

JOHNSON, Chief Judge:

A general court-martial composed of officer members convicted Appellant of one specification of assault consummated by battery of KP in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928.[2,3] The court members sentenced Appellant to be dismissed from the service. The convening authority approved the adjudged sentence.

Appellant raises ten issues for our consideration on appeal: (1) whether the evidence is legally and factually sufficient to support the conviction; (2) whether the military judge erred in failing to permit the admission of certain evidence pursuant to Military Rule of Evidence (Mil. R. Evid.) 412(b)(3); (3) whether the military judge erred by failing to admit as an excited utterance a certain statement by Appellant; (4) whether the military judge erred when he admitted evidence of a witness's opinion of Appellant's character for untruthfulness; (5) whether trial counsel engaged in prosecutorial misconduct during the Government's findings and sentencing arguments; (6) whether the absence of a unanimous verdict requirement deprived Appellant of his Fifth Amendment[4] and Sixth Amendment[5] rights; (7) whether the military judge erred by providing the court members a sentencing instruction on mendacity; (8) whether the military judge abused his discretion when he instructed the court members that recoupment of educational expenses was a collateral consequence the court members should disregard; (9) whether Appellant's sentence was inappropriately severe; and (10) whether the findings and sentence should be set aside under the cumulative error doctrine. Although not raised by Appellant, we address an additional issue: (11) whether Appellant is entitled to relief for unreasonable post-trial delay. We have carefully considered issues (4), (6), and (10) and find they do not require discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987); *see also United States*

---

[2] References to the punitive articles of the UCMJ are to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise indicated, all other references to the UCMJ, Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] Appellant was found not guilty of one specification of rape in violation of Article 120, UCMJ, 10 U.S.C. § 920. The specification of assault consummated by a battery of which Appellant was convicted was a lesser included offense of the charged offense of rape.

[4] U.S. CONST. amend. V.

[5] U.S. CONST. amend. VI.

*v. Anderson*, No. ACM 39969, 2022 CCA LEXIS 181, at \*57 (A.F. Ct. Crim. App. 25 Mar. 2022) (unpub. op.) (finding unanimous court-martial verdicts not required), *rev. granted*, ___ M.J. ___, 2022 CAAF LEXIS 529 (C.A.A.F. 25 Jul. 2022). We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

In June 2018, Appellant and KP were United States Air Force Academy (USAFA) cadets between their third and fourth years at the USAFA. Appellant and KP knew each other, were on friendly terms, and socialized in overlapping groups of cadets. Among other mutual acquaintances, Appellant was becoming friends with KP's ex-boyfriend, Cadet YB.[6] Appellant and KP regularly exchanged text messages and provided advice to each other regarding potential romantic relationships. However, Appellant and KP did not themselves have any sexual or romantic relationship.

On 2 June 2018, KP, Appellant, and two other (male) cadets shared a hotel room during an overnight trip to Denver, Colorado. KP and Appellant slept on the same bed, but did not engage in any sexual or other intimate activity.

On the night of 7 June 2018, KP and her female friend Cadet GS were at a bar in Colorado Springs, Colorado, where a number of other cadets were present. KP sent a text message to Appellant inviting him to join her and Cadet GS at the bar. Appellant agreed and brought a male cadet friend of his, Cadet TK, with him. At the bar, the cadets socialized and danced. During the evening Appellant and KP spoke again about their romantic interest in other cadets; in particular, Appellant indicated he was attracted to KP's friend Cadet GS, with whom he had no prior relationship. At one point Appellant danced specifically with Cadet GS in order to teach her how to dance to salsa music. Appellant later estimated he drank three glasses of beer at the bar; KP also drank beer but estimated it was less than Appellant drank.

After some time, the four cadets—KP, Cadet GS, Appellant, and Cadet TK—rode back to the USAFA together, driven by Cadet HF, a male friend of KP and Cadet GS who had agreed to serve as a designated driver. Once they arrived at the cadet dormitories, the group split up as the cadets—with the

---

[6] Like many of the witnesses in this case, Cadet YB had been commissioned as a second lieutenant by the time of Appellant's trial. We refer to witnesses according to their status at the time of the events that were the subject of the court-martial.

exception of Appellant—headed to their own dorm rooms.[7] KP, Cadet GS, and Cadet HF all lived in the same building. When Cadet GS split off from the others, KP told Appellant that he could "take his shot" at Cadet GS, or words to that effect. However, KP doubted Appellant would succeed, in part because she knew Cadet GS was already in a long-term relationship with another cadet.

After Cadet GS split off from the group, Appellant followed her down a hallway on the pretext that he wanted to use her vaporizer. However, after Appellant approached Cadet GS he abruptly kissed her on the mouth. Shocked, Cadet GS pulled away from Appellant and told him she had to go. At that point, Cadet GS's cadet squadron commander appeared and engaged in a brief conversation with Cadet GS while Appellant ducked into a restroom.

When Appellant emerged from the restroom, Cadet GS had returned to her room. Appellant did not know where Cadet GS's room was, so he contacted KP who provided him the information. After Appellant indicated he was going to Cadet GS's room, KP sent Appellant a text message providing him KP's own purported room number[8] "if it fails," meaning if Appellant's efforts with Cadet GS were unsuccessful. KP later testified that by this text message she intended to offer to let Appellant stay in her room because he lived in a different building, but she did not intend it as an invitation for him to "try anything sexual."

After Cadet GS returned to her room, she sent a text message to KP that Appellant had just kissed her. KP, who had provided Cadet GS's room number to Appellant, sent Cadet GS a text message to the effect that Appellant was on his way to Cadet GS's room. This caused Cadet GS to text and call Cadet HF to ask him to come to her room. Appellant walked into Cadet GS's room and sat down in a chair. This made Cadet GS uncomfortable, and she moved around the room cleaning until Cadet HF arrived. Cadet HF later testified that Cadet GS looked at Cadet HF and silently mouthed the words "get him out" or something similar, referring to Appellant. Cadet HF remained in the room in order to create an awkward situation to induce Appellant to leave. After some period of time Appellant did leave, telling Cadet HF and Cadet GS something to the effect that he was going to "try [KP]" or go to KP's room to "see what happens."

After leaving Cadet GS's room, Appellant did go to KP's room. Both KP and Appellant testified at Appellant's trial and provided significantly different

---

[7] Many of the cadets had recently moved into different dormitory rooms for the summer, leading to some lack of knowledge and confusion regarding where some cadets were living.

[8] KP accidentally sent Appellant an incorrect room number, which was a different room on the same floor as KP's own room.

accounts of what occurred there. According to KP, she had left her door unlocked consistent with USAFA "cadet culture." Because she had a room to herself for the summer, she had pushed two single beds together to form one large bed. When Appellant arrived, KP was "curled up on the far side of the bed" wearing her sleeping clothes: a t-shirt and shorts. KP acknowledged Appellant but did not get up and attempted to go to sleep, expecting Appellant to do the same. Instead, Appellant got onto the bed and grabbed KP's shoulder to roll her over. KP responded by telling Appellant in an assertive tone, "If this is what you're here for, you can get the f**k out." Appellant ignored her and began kissing her neck, with his legs straddling her torso. He pulled off her t-shirt, began kissing her breasts, and bit her on the right side of her torso, which was painful and left a mark. KP protested and unsuccessfully attempted to push Appellant off. Appellant also strangled KP with one hand with "significant" force, although not enough to cause her to lose consciousness. Appellant then moved lower on her body, using his elbows to push her thighs apart, and penetrated her vagina with "at least" two fingers without removing her shorts. Appellant continued to ignore KP's protests and moved up her body to strangle her again. KP used a move she had learned in combat training to roll Appellant over and move out from under him. KP got off the bed and grabbed her shirt and her phone, which she used to call and text Cadet GS and to text another cadet for help.

Appellant testified to a different version of events. According to Appellant, when he arrived at KP's room she was brushing her teeth. Appellant sat down on a couch. KP asked him about his visit to Cadet GS's room, and Appellant told her he left after Cadet HF arrived. They then discussed other topics, including Appellant's ex-girlfriend, a male cadet KP was interested in, and an upcoming trip to Denver they had planned together. KP invited Appellant to stay the night and said he could sleep on the bed. They lay on the bed next to each other and continued talking until Appellant leaned over and kissed KP and she kissed him back. Appellant moved on top of KP and progressed to kissing and "sucking" KP's neck and chest. KP helped Appellant remove his shirt, and Appellant progressed to kissing the right side of her torso on her ribs. As Appellant kissed KP's neck again, KP said "I don't think this is a good idea." Appellant stopped briefly but began "making out" with KP again. KP then "flipped" Appellant over onto his back by pushing on his shoulder so that she was straddling him. KP then kissed and sucked on Appellant's neck before sitting up and stating to him, "We're not doing this." KP then got off the bed, went to the vanity mirror, and began using her phone. According to Appellant, although he may have touched KP's groin over her clothing, at no point did he penetrate her vagina with his fingers.

After Cadet GS received a text from KP stating "Sos," Cadet GS went to KP's room, bringing Cadet HF with her. When Cadet GS and Cadet HF

arrived, Cadet GS perceived KP appeared "distraught" and Cadet HF observed KP was "crying." KP exited the room without speaking, leaving Appellant on KP's bed with his shirt off. Cadet HF asked Appellant why his shirt was off; Appellant responded that it was hot in KP's room. KP returned to the room shortly thereafter; she still appeared upset and uncomfortable. Either Cadet GS or Cadet HF suggested they go to Cadet HF's room to eat, and KP, Cadet GS, and Cadet HF departed KP's room together, leaving Appellant behind. Later, in Cadet HF's room, KP told Cadet GS and Cadet HF that Appellant had gotten on top of her, bitten her, and "choked" her. KP showed them various marks on her body which Cadet GS took pictures of, including a mark on the right side of KP's torso. However, at that time KP did not tell Cadet GS and Cadet HF that Appellant had penetrated her vagina with his fingers.

After KP, Cadet GS, and Cadet HF left Appellant at KP's room, Appellant went to the room of Cadet TK, the friend who had gone to the bar with him earlier that night. Cadet TK was asleep at the time, but Appellant spoke with Cadet TK's roommate, which awoke Cadet TK. Cadet TK later recalled Appellant said "[Appellant] shouldn't have hooked up with his friend's -- or his friend's ex," or words to that effect. In response, Cadet TK told Appellant to go to bed and come talk to him in the morning.

At some point in the early morning hours of 8 June 2018, Appellant sent KP the following text: "On a real note, no weird s**t, we still plan[n]ing on doing Denver with the group or should we make different plans?"

Later during the day on 8 June 2018, Appellant came to KP's room and spoke with her. According to KP, Appellant acknowledged that "it got rough" the night before and apologized to her. KP responded, "It's okay," and Appellant departed.

At another point that day, although KP and Cadet YB were no longer in a relationship, KP sent Cadet YB images of the marks Appellant had made on her body and met with Cadet YB in person to inform him of what Appellant had done. KP told Cadet YB the incident was nonconsensual. Cadet YB then confronted Appellant about what KP told him. Appellant told Cadet YB the encounter was consensual and showed Cadet YB the text KP had sent Appellant with her purported room number and an apparent hickey that Appellant claimed KP made on his neck. Appellant then called KP in Cadet YB's presence, without KP's knowledge that Cadet YB was there. According to Cadet YB's testimony, KP was angry during the call and she indicated "something to the effect" that Appellant was misrepresenting the incident as consensual.

The evening of the same day, 8 June 2018, KP called Appellant while he was driving; unknown to KP, another friend of Appellant's, Cadet DR, was riding in Appellant's passenger seat. According to Cadet DR's later testimony:

> [KP] was questioning why [Appellant] was telling his friends a certain story that was false, and why he was lying to his friends, [to] which he responded ["]I don't know what you're talking about. I'm just telling them exactly what happened.["]
>
> . . . .
>
> She went on to say ["]I'm going to convince your friends that you are wrong; that you were lying. If you keep fighting me on this, I'm going to convince your friends that you are wrong and you are going to lose.["]

On 10 June 2018, KP underwent a sexual assault forensic examination at a civilian hospital in Colorado Springs. The nurse examiner, CO, noted KP had bruising on both her legs, her upper chest, and the rib area of her right torso. Notably, CO described the bruising on KP's ribs as "red bruising with central clearing," meaning it was "circular" with "nothing in the middle," "consistent with a bite mark, like [KP] said." CO did not identify any injuries in KP's genital area.

KP reported the alleged sexual assault by Appellant to the Air Force Office of Special Investigations (AFOSI) and was interviewed approximately two months later, in early September 2018. AFOSI agents also interviewed Appellant, who initially waived his rights and agreed to speak with the agents. Appellant denied the 8 June 2018 incident with KP was nonconsensual and denied he penetrated KP's vagina.[9]

Appellant was charged with one specification of rape in violation of Article 120, UCMJ, specifically by committing the sexual act of penetrating KP's vagina with his fingers, using unlawful force and with the intent to gratify his sexual desires. The court members found Appellant not guilty of the charged offense, but guilty of the lesser included offense of assault consummated by battery in violation of Article 128, UCMJ, by unlawfully doing bodily harm to KP by biting her.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our

---

[9] At trial, although Appellant continued to deny he penetrated KP's vagina, on cross-examination he admitted he made several false statements during his AFOSI interview.

assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted), *rev. denied*, 82 M.J. 278 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (internal quotation marks and citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (internal quotation marks and citation omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

In order to convict Appellant of the lesser included offense of assault consummated by battery in violation of Article 128, UCMJ, the court members were required to find beyond a reasonable doubt: (1) that Appellant did bodily harm to KP; and (2) that the bodily harm was done with unlawful force or violence. *See Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 54.b.(2). "'Bodily harm' means any offensive touching of another, however slight." 2016 *MCM*, pt. IV, ¶ 54.c.(1)(a).

The defense of mistake of fact is available so long as the circumstances as the accused mistakenly believed them to be would render his conduct non-criminal. If the mistake pertains to an element requiring specific intent, that mistake "need only have existed in the mind of [Appellant]." Rule for Courts-Martial (R.C.M.) 916(j)(1). If, however, the mistake pertains to an element requiring only general intent, Appellant's mistake must not only exist in his mind, but it also "must have been reasonable under all the circumstances." *Id.* Once

this defense is raised, the Government must prove—beyond a reasonable doubt—the defense did not exist. R.C.M. 916(b)(1).

### 2. Analysis

The Government introduced sufficient evidence for a rational factfinder to find Appellant guilty of Article 128, UCMJ, beyond a reasonable doubt. KP testified that Appellant—in the course of kissing and sucking several areas of her body without her consent and despite her verbal protests and physical resistance—bit her on the right side of her torso. KP described the pain from the bite as "awful" and an "eight" on a "scale of one to ten." The bite left a mark that was witnessed and photographed later that night by Cadet GS and Cadet HF. The bite was still visible as a circular bruise that CO, the sexual assault nurse examiner, observed two days later. CO testified that the bruise was "consistent" with a bite mark and with KP's description of the assault. Moreover, seven witnesses called by the Government testified to either their opinion that KP had the character trait of truthfulness, KP's reputation for being truthful, or both. In addition, Appellant's own testimony suggested he caused the bruise in question, as he testified he kissed and sucked on KP's right rib cage vigorously enough to "cause[ ] marks."

Appellant raises several arguments as to why the evidence is nevertheless insufficient, focusing on asserted problems with the reliability of KP's testimony. Appellant groups these arguments into three general categories.

First, Appellant asserts KP had significant motives to fabricate a false allegation that her encounter with Appellant was non-consensual. During the trial, there was testimony from several witnesses regarding a "code" of behavior among the male and female cadets which disfavored pursuing a romantic or sexual relationship with the ex-girlfriend or ex-boyfriend of someone within one's friend group. KP was a friend of Appellant's ex-girlfriend, another USAFA cadet. Appellant suggests KP had this code in mind when she stopped what had been, according to his testimony, a consensual encounter with Appellant in KP's dorm room. Appellant further suggests that when KP "looked in the mirror and saw the hickeys forming [on her body], she instantly went into cover-up mode. This friend code and her desire to avoid the perception that she would break the code is what motivated her entire fabrication of the accusations against [Appellant]." Appellant further posits that this motivation explains why KP did not initially tell Cadet GS and Cadet HF that Appellant had penetrated her vagina; instead, KP escalated her accusations the following day after she learned Appellant was telling other cadets about their encounter.

The Defense made similar arguments at trial, and they may well have been effective in raising reasonable doubt to a degree as the court members found Appellant not guilty of the charged offense of rape. However, a reasonable

factfinder may find one portion of a victim's allegation proven beyond a reasonable doubt, while finding other allegations—even if generally credible—do not meet that high threshold. *Cf. United States v. Bare*, 63 M.J. 707, 713 (A.F. Ct. Crim. App. 2006) (citing *United States v. Harris*, 8 M.J. 52, 59 (C.M.A. 1979)) ("Court members may believe one portion of a witness's testimony but disbelieve others."). Accordingly, notwithstanding Appellant's argument, a reasonable factfinder could have believed KP's testimony that Appellant bit her without her consent, reinforced by her immediate report to Cadet GS and Cadet HF, the physical evidence of the bite, a consistent statement to CO during the forensic exam, and CO's expert testimony. Moreover, the testimony included multiple examples of cadets breaking the so-called code without facing lasting ostracism by other cadets—for example, Appellant's encounter with KP evidently did not impair his growing friendship with her ex-boyfriend, Cadet YB. A reasonable factfinder could also question the plausibility that KP would persist in falsely accusing Appellant of a serious crime for such little evident gain.

Second, Appellant highlights evidence he contends indicates the encounter with KP was consensual, or in the alternative that Appellant reasonably believed it was consensual. Although he concedes he had no prior romantic interaction with KP prior to 7–8 June 2018, he testified that night was "different." He notes KP invited him to join her and Cadet GS at the bar, sat close to him throughout the night, and—according to his testimony—discussed certain preferred sexual behavior with him, including "biting." He further cites the text message KP sent Appellant inviting him to come to her dorm room if his advances toward Cadet GS did not succeed. Appellant also asserts post-incident behavior by himself and KP indicate the incident was consensual. For his part, Appellant argues that if he had actually assaulted KP, it is implausible he would simply remain in her room after she "escaped" and called for help. For KP's part, Appellant contends it is not plausible that, having escaped from a sexual assault, she would remain in her room with Appellant until Cadet GS and Cadet HF arrived. Finally, Appellant notes CO could not testify the bruise on KP's right side was definitely caused by a bite, and he contends the bruising on KP's body could be consistent with a consensual encounter as well as a nonconsensual one.

Again, Appellant's points echo arguments the Defense presented at trial and which may have been effective to some degree. However, for reasons similar to those explained above, a rational factfinder could nevertheless find Appellant bit KP without her consent, and without being reasonably mistaken as to her consent. We do not find it implausible that a cadet, having been assaulted by another cadet, would remain in her own dorm room after the assault until help arrived, notwithstanding the presence of her assailant. Nor do we find it implausible that Appellant would remain in the room or attempt to carry

on as if nothing untoward had occurred—much as Appellant did earlier that night when he loitered in Cadet GS's room after she rejected his kiss. In addition, Appellant's argument relies in part on his own testimony, and the court members might reasonably have found his credibility lacking in light of his admitted lies during his AFOSI interview, certain contradictions in his testimony, and opinion testimony regarding his character for untruthfulness.

Finally, Appellant cites asserted omissions and inconsistencies KP made in her description of the circumstances of the alleged offense in various statements to other cadets, to the nurse examiner CO, and to the AFOSI. It is true that at times KP omitted certain events or details from her statements. For example, in her earliest statements to Cadet GS and Cadet HF, KP did not assert that Appellant digitally penetrated her vagina. Similarly, KP did not initially tell the AFOSI that she invited Appellant to the bar, or later sent the text message inviting him to her room. Appellant contends it is particularly significant that, when asked at her interview, KP told AFOSI she did not have text messages relevant to her allegations.[10] However, none of the omissions or asserted inconsistencies remotely approach a suggestion on KP's part that the allegations against Appellant were not true. Moreover, a rational factfinder might reasonably find it unsurprising that a victim would decline to share every detail of the alleged offense on every occasion, especially where such details are particularly sensitive, disturbing, or—in retrospect—embarrassing to the victim. Similar to Appellant's other points, such arguments may have contributed to reasonable doubt in the minds of court members as to some aspects of KP's allegations, but in the context of the entire trial the omissions and inconsistencies Appellant cites are not nearly so profound as to render Appellant's conviction legally insufficient.

Accordingly, drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's conviction for assault consummated by a battery. Additionally, having weighed the evidence in the record of trial, and having made allowances for the fact that the court members personally observed the witnesses and we did not, we also find the evidence factually sufficient.

---

[10] Although the AFOSI did not initially obtain text messages from KP's phone, the messages were eventually disclosed to the parties as a result of a defense motion to compel discovery.

**B. Mil. R. Evid. 412**

**1. Additional Background**

Before trial, pursuant to Mil. R. Evid. 412(c)(1) the Defense moved to admit evidence that KP engaged in certain sexual behavior.[11] The Government and KP (through her Special Victims' Counsel) opposed the motion in part. In particular, the Government and KP opposed the Defense's intent to introduce evidence that KP had engaged in specific behavior with someone other than Appellant that might be characterized as "rough sex." The Defense argued such evidence was constitutionally required to ensure the trier of fact was not left with the mistaken impression that KP would never consensually engage in behavior that left bruises or other marks on her body.

After conducting a closed hearing at which he received witness testimony and argument from counsel, the military judge issued an oral ruling in which he granted the Defense's motion in part and denied it in part. The military judge permitted the Defense to introduce, *inter alia*, evidence that KP had told Appellant at the bar on the night of 7–8 June 2018 that she "liked" to engage in certain sexual behavior. However, the military judge did not permit the Defense to elicit evidence that KP had engaged in specific sexual behavior with another individual or had a generalized interest in certain sexual activities. The military judge explained that although such evidence might "have some very generalized relevance, as [Appellant] claims [KP] told him about her interests," such a "generalized interest, divorced from [KP's] actions with [Appellant], [was] neither material nor vital." The military judge further noted such evidence might become admissible depending on KP's trial testimony.

At trial, Appellant testified KP told him at the bar that she liked "hair pulling and biting."[12] The military judge later instructed the court members that they could consider this evidence "for its tendency, if any, to demonstrate consent[;] for its tendency, if any, to demonstrate the [Appellant's] honest and reasonable mistaken belief that [KP] consented to the charged conduct[;] and/or . . . for its bearing, if any, on the credibility of any witness."

**2. Law**

"We review the military judge's ruling on whether to exclude evidence pursuant to M.R.E. 412 for an abuse of discretion." *United States v. Ellerbrock*, 70

---

[11] The trial transcript, appellate exhibits, and briefs addressing this issue were sealed pursuant to R.C.M. 1113. These portions of the record and briefs remain sealed, and any discussion of sealed material in this opinion is limited to that which is necessary for our analysis.

[12] During their testimony, KP and Cadet GS denied KP flirted with Appellant at the bar on 7–8 June 2018.

M.J. 314, 317 (C.A.A.F. 2011) (citing *United States v. Roberts*, 69 M.J. 23, 26 (C.A.A.F. 2010)). The military judge's findings of fact are reviewed for clear error and his conclusions of law are reviewed de novo. *Id.* (citing *Roberts*, 69 M.J. at 26). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted). "For [a] ruling to be an abuse of discretion, it must be 'more than a mere difference of opinion'; rather, it must be 'arbitrary, fanciful, clearly unreasonable' or 'clearly erroneous.'" *United States v. Collier*, 67 M.J. 347, 353 (C.A.A.F. 2009) (quoting *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (additional citations omitted)).

Mil. R. Evid. 412 provides that in any proceeding involving an alleged sexual offense, evidence offered to prove the alleged victim engaged in other sexual behavior or has a sexual predisposition is generally inadmissible, with three limited exceptions. When the defense is the proponent of such evidence, it bears the burden to overcome the general rule of exclusion by demonstrating an exception applies. *United States v. Leonhardt*, 76 M.J. 821, 826 (A.F. Ct. Crim. App. 2017) (citation omitted).

Mil. R. Evid. 412(b)(2) provides that evidence of an alleged victim's other sexual behavior or sexual predisposition is admissible if its exclusion "would violate the constitutional rights of the accused." Generally, such evidence is constitutionally required and "must be admitted within the ambit of [Mil. R. Evid.] 412(b)(1)(C) when [it] is relevant, material, and the probative value of the evidence outweighs the dangers of unfair prejudice." *Ellerbrock*, 70 M.J. at 318 (citation omitted). Relevant evidence is evidence that has any tendency to make the existence of any fact of consequence to determining the case more probable or less probable than it would be without the evidence. Mil. R. Evid. 401. Materiality "is a multi-factored test looking at 'the importance of the issue for which the evidence was offered in relation to the other issues in this case; the extent to which the issue is in dispute; and the nature of the other evidence in the case pertaining to th[at] issue.'" *Ellerbrock*, 70 M.J. at 318 (alteration in original) (citations omitted). The dangers of unfair prejudice to be considered "include concerns about 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Id.* at 319 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

### 3. Analysis

Appellant contends the military judge abused his discretion because evidence that KP had a generalized interest in particular behavior was constitutionally required because, without it, "the fact-finder was left with the

incomplete, mistaken and unfairly prejudicial belief that [KP] would not engage in these sorts of behaviors and therefore it must have been nonconsensual." We disagree.

As a threshold matter, we find evidence of KP's sexual behavior or interests fell plainly within the scope of Mil. R. Evid. 412(a). Therefore, such evidence was inadmissible unless an exception applied. Appellant relies on the constitutionally required exception under Mil. R. Evid. 412(b)(1)(C). Therefore, the question becomes whether the evidence of KP's behavior with someone other than Appellant or KP's generalized interest in certain activity were relevant and material with regard to the charged acts, and whether such probative value outweighed the dangers of unfair prejudice.

This court addressed similar situations in *United States v. Rameshk*, No. ACM 39319, 2018 CCA LEXIS 520, *6–12 (A.F. Ct. Crim. App. 29 Oct. 2018) (unpub. op.), and *United States v. Stephan*, No. ACM 38568, 2015 CCA LEXIS 347 (A.F. Ct. Crim. App. 25 Aug. 2015) (unpub. op.), both of which the military judge cited in rendering his decision. In *Stephan*, this court explained that "[c]onsent to sexual contact is based on the identity of the partner, not on the victim's willingness to engage in any specific type of contact with others." *Stephan*, unpub. op. at *6 (citing *United States v. Booker*, 25 M.J. 114, 116 (C.M.A. 1987) ("[C]onsent to the [sexual] act is based on the identity of the prospective partner."). Similarly, in *Rameshk* we explained that evidence of the alleged victim consenting to engage in certain sexual activity *with another* "create[d] no inference that [the alleged victim] consented to sexual activity *with [the a]ppellant*." *Rameshk*, unpub. op. at *11.

Likewise, in the instant case the military judge reasonably determined that evidence that KP consented to engage in certain behavior with another individual was not material to the question of whether she consented to similar activity with Appellant. The military judge properly permitted evidence (from Appellant himself) that KP told Appellant on the night in question that she "liked" certain behavior; evidence that KP told Appellant this, if true, was relevant and material to the court members' determination of whether KP subsequently consented to similar behavior with Appellant, or whether he reasonably but mistakenly believed that she did. *See* Mil. R. Evid. 412(b)(1)(C); *see also* Mil. R. Evid. (b)(1)(B) ("[E]vidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct [is admissible], if offered by the accused to prove consent . . . ."). In contrast, KP's behavior with *someone else* created no inference that she consented to engage in such behavior with *Appellant*. Accordingly, we find the military judge did not abuse his discretion by excluding such evidence.

**C. Excited Utterance**

**1. Additional Background**

During the cross-examination of KP, the civilian trial defense counsel (CivDC) questioned her about the call she made to Appellant as he was driving with Cadet DR in his passenger seat. Counsel elicited that during the call, KP accused Appellant of lying to other cadets about what had occurred the night before. When the CivDC then asked KP whether Appellant denied the accusation, trial counsel objected to hearsay. In response to this objection, the CivDC stated that he would "lay the foundation" for an excited utterance. The CivDC then elicited that KP perceived Appellant "was upset about the accusation that he was lying." Trial counsel renewed the objection to hearsay, arguing the Defense had not laid an adequate foundation for the excited utterance exception.

The military judge initially overruled the objection:

> Okay. Trial Counsel, at this point, I'm going – I'm going to overrule the objection. I find that it could qualify as an excited utterance, insofar as being confronted with an accusation of sexual assault could be an emotionally disturbing event, and a response made directly after being confronted with that, still qualifies as being within the tumult of that.

> So while all my rulings are subject to reconsideration, if you have any countervailing case law or anything like, that that stands for the proposition that an excited utterance should not apply during an accused's denial of an allegation, at this point, I'm going to overrule the objection. I'll permit the statement.

KP then testified that Appellant denied her accusation that he was lying.

Following an overnight break in KP's testimony, the Government requested the military judge reconsider his ruling. Citing *United States v. Moolick*, 53 M.J. 174 (C.A.A.F. 2000), and *United States v. Arnold*, 25 M.J. 129 (C.M.A. 1987), trial counsel contended the Defense had laid an inadequate foundation for an excited utterance because the evidence was KP confronting Appellant merely about lying that he had "hooked up" with Cadet GS and KP, not that she was accusing him of committing a sexual assault. In response, the CivDC essentially argued that, in context, Appellant would have understood that KP was accusing him of sexual assault. After some discussion, the military judge announced he would "hold" his ruling on the reconsideration request pending an opportunity to voir dire Cadet DR, who was an anticipated defense witness.

The military judge subsequently questioned Cadet DR in an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session. Cadet DR confirmed on the night of 8 June

2018 he was present in Appellant's car and heard the conversation between KP and Appellant.[13] Cadet DR testified KP asked Appellant "why are you telling your friends this story -- the story that you're coming up with, and lying to them and telling them just a fake story." Cadet DR testified that in response, Appellant made a "confused" facial expression. According to Cadet DR, KP further told Appellant that "if you keep telling these stories or fighting me on this . . . I'll convince all your friends that you're lying, and that you're incorrect, and you're going to lose this," or words to that effect. In response, Appellant said "'I don't know what you're talking about. I'm telling the truth. I'm telling them exactly what happened,' and stuff like that." When the military judge inquired about Appellant's tone of voice, Cadet DR responded: "Level-headed. I remember, specifically, level-headed." Cadet DR further testified Appellant continued driving during the call, and his demeanor was otherwise "normal, as far as how he normally behaves." Trial counsel briefly questioned Cadet DR; trial defense counsel declined to do so.

Following brief additional arguments from counsel and a lunch break, the military judge entered an oral ruling in which he reconsidered his prior ruling and now found the Defense had not laid an adequate foundation for the excited utterance exception. After summarizing the relevant testimony of KP and Cadet DR and the applicable law articulated in *Moolick* and *United States v. Barnes*, No. ACM 39720, 2016 CCA LEXIS 267 (A.F. Ct. Crim. App. 27 Apr. 2016) (unpub. op.), the military judge explained a "level-headed response and a look of confusion is not the adequate level of excited utterance."

The military judge subsequently advised the court members that he had reconsidered the prior ruling. He explained to them that they were not to consider Appellant's denial for the truth of the asserted denial, but only "for the limited purpose of the effect on the listener," KP. The military judge asked if the court members had any questions regarding the ruling; none did.

### 2. Law

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017) (citation omitted). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003) (citing *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly

---

[13] Cadet DR testified he was Appellant's roommate at the time and they had been very close friends for approximately two years.

unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)).

Mil. R. Evid. 803(2) provides that an "excited utterance," defined as a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused," is an exception to the general prohibition on hearsay evidence. *See* Mil. R. Evid. 801, 802; *Bowen*, 76 M.J. at 87–88. "The guarantee of trustworthiness of an excited utterance is that the statement was made while the declarant was still in a state of nervous excitement caused by a startling event." *United States v. Chandler*, 39 M.J. 119, 123 (C.M.A. 1994) (citation omitted). "[T]o qualify as an excited utterance: (1) the statement must be 'spontaneous, excited or impulsive rather than the product of reflection and deliberation'; (2) the event prompting the utterance must be 'startling'; and (3) the declarant must be 'under the stress of excitement caused by the event.'" *United States v. Henry*, 81 M.J. 91, 96 (C.A.A.F. 2021) (quoting *United States v. Arnold*, 25 M.J. 129, 132 (C.M.A. 1987)). "The proponent of the excited utterance has the burden to show by a preponderance of the evidence that each element is met." *Id.* (citation omitted).

Whether an error is harmless is a question of law we review de novo. *Bowen*, 76 M.J. at 87 (quoting *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003)). "For nonconstitutional errors, the Government must demonstrate that the error did not have a substantial influence on the findings." *Id.* (internal quotation marks omitted) (quoting *McCollum*, 58 M.J. at 342). "We evaluate the harmlessness of an evidentiary ruling by weighing: '(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.'" *Id.* at 89 (quoting *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)).

**3. Analysis**

Appellant contends the military judge abused his discretion because the evidence established each of the three elements of the *Arnold* test for an excited utterance. To the contrary, we find the military judge's conclusion that the evidence failed to demonstrate Appellant spoke in a state of nervous excitement in response to a startling event to be well-supported. As for the startling event, Appellant already had many hours to consider the possible ramifications of his encounters with Cadet GS and KP the night before; he already had a contentious phone conversation on the same subject with KP in Cadet YB's presence earlier in the day; and KP did not explicitly accuse Appellant of sexual assault during the conversation. However, even more telling was Cadet DR's testimony that Appellant merely looked "confused" but his demeanor was otherwise "normal," Cadet DR's emphasis that Appellant remained "level-headed," and the

17

fact that Appellant continued driving to his destination without stopping or any apparent incident. That KP, who unlike Cadet DR was not present with Appellant and therefore had a far more limited observation of Appellant's demeanor, testified to her impression that Appellant was "upset," is not sufficient countervailing evidence to render the military judge's ruling an abuse of discretion.

Furthermore, assuming *arguendo* the military judge did err, we find any such error had no influence on the findings. The military judge's instruction that the court members were not to consider Appellant's denial for its substance was of scant significance in the broader context of the trial. The testimony from several witnesses regarding the context of Appellant's phone conversations with KP—both while he was in the car with Cadet DR and earlier in the dorm with Cadet YB—made it apparent Appellant portrayed their encounter as consensual. More to the point, Appellant himself testified at trial and described the encounter with KP as essentially consensual. Therefore, although this was a closely contested case, as the findings indicate, the substance of this specific statement was of negligible materiality to the trial's outcome.

## D. Trial Counsel Arguments

### 1. Additional Background

#### a. Findings Argument

During Appellant's cross-examination, he admitted that he had lied at several points during his AFOSI interview. During trial counsel's closing argument on findings, she twice referred to Appellant as a "proven liar." After the second instance the CivDC objected citing the United States Court of Appeals for the Armed Forces (CAAF) decision in *United States v. Voorhees*, 79 M.J. 5 (C.A.A.F. 2019). The military judge responded:

> All right. Counsel, we don't need the case law cite. I will say this: So, Members, I do direct you to disregard any reference from counsel just saying that the accused is a liar. That's stricken. That's out. It is for you to determine the credibility of the witnesses in this case. Counsel's personal opinions about the credibility of the witnesses in this case aren't dispositive. What is dispositive is your weighing of the evidence. Counsel may offer their analysis of the evidence and how they think you should weigh the credibility, but ultimately, you must determine the credibility of witnesses and the weight of the evidence.

> Trial Counsel, please do not reference the accused as a liar again. You may comment upon whether his statements are credible or not credible based upon the evidence, but we'll avoid the label. With that, please continue.

Thereafter, trial counsel refrained from specifically referring to Appellant as a "liar." However, trial counsel repeatedly referred to Appellant's admissions that he had lied to the AFOSI agents "no less than" ten times, and she asserted Appellant had lied under oath during his trial testimony. Trial defense counsel did not object to these references to Appellant's lies, and the military judge did not specifically address them.

At several points during her argument, trial counsel commented on evidence of the informal social code of conduct among cadets, referring to it as the "bro code." Multiple times she also referred to Appellant and to the male former cadets who testified as defense witnesses as "bros." For example, at one point trial counsel contrasted what she characterized as KP's credible testimony with

> the accused's testimony and his band of bros. The truth is easy to speak and quick. The accused and his whole bro code group came in here and were stumped, slow to reply, careful and cautious, clearing their throats, not wanting to hurt their bro, socializing and talking [outside the courtroom] during this case about this case. These are all factors that go into your credibility determination . . . .

In the concluding paragraph of her findings argument, trial counsel argued:

> Don't let the bro code silence a sexual assault victim. Don't make it impossible for female cadets like [KP] to get justice, and don't allow friends who have spoken to each other about the case who are stationed together, who have banded together to hide accountability, to cloud what justice is in this case.

Trial defense counsel did not object to trial counsel's use of the term "bro" or to the suggestion that sexual assault victims might be "silenced."

### b. Sentencing Argument

Trial counsel's sentencing argument included the following:

> Members, [Appellant] got on that stand and lied to you under oath to your faces. Based on your findings, he lied under oath when he said that the bite mark was a consensual wanted hickey. He lied to his friends. He lied to federal agents. And that's how you know that his potential for rehabilitation is low.

> From a demerit he received on 22 July 2015 for lying to his cadet cadre, which is on page 35 of Prosecution Exhibit 14, all the way up to this past week where he lied to you under oath about his application of force, the accused has demonstrated that he has a

19

> poor rehabilitative potential. And in light of that, a dismissal is the only appropriate and reasonable outcome in this case.
>
> Part of what makes USAFA so reputable is that America's best and brightest come here. Looming large on the terrazzo are the words "We will not lie . . . ."

At that point, trial defense counsel objected on the basis that trial counsel's argument was "essentially equivalent [to] getting into the core values." The military judge overruled the objection, commenting that the core values "are within the knowledge of the members" and "[c]iting the cadet honor code is not unfair sentencing argument."[14]

Trial counsel continued:

> "We will not lie, steal, or cheat, nor tolerate among us anyone who does." [Appellant] violated that code. He lied about his application of force. He stole [KP's] sense of security. And he cheated her out of what was supposed to be a positive college experience. This is an institution in which female cadets must feel safe, an institution where we produce the best of the Air Force. This is not an institution where cadets harm one another. This is not an institution where female cadets have to get medical treatment --

Trial defense counsel objected again, this time on the basis that trial counsel was "talking globally" and her argument was "not related to the specific named victim." The military judge sustained this objection, commenting: "While you may make arguments concerning general deterrence, it shouldn't be the predominant theme of your sentencing argument. It may be included amongst other themes, but with that, sustained, and you may continue."

### 2. Law

"We review prosecutorial misconduct and improper argument de novo and where . . . no objection is made, we review for plain error." *Voorhees*, 79 M.J. at 9 (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)). Under plain error review, the appellant bears the burden to demonstrate error that is

---

[14] In a later Article 39(a), UCMJ, hearing, the military judge explained that his decision to overrule the objection was based on *United States v. Hill*, No. ACM 38797, 2017 CCA LEXIS 477, at *19 (A.F. Ct. Crim. App. 12 Jul. 2017) (unpub. op.) ("[T]he Air Force Core Values are meant to be inspirational and aspirational, but are not interjected inappropriately as 'command policy' when referenced during the sentencing phase of a court-martial.") (quoting *United States v. Gatewood*, 65 M.J. 724, 726 (A.F. Ct. Crim. App. 2007)).

clear or obvious and results in material prejudice to his substantial rights. *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citation omitted).

"Improper argument is one facet of prosecutorial misconduct." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citation omitted). "Prosecutorial misconduct occurs when trial counsel 'overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014) (alteration in original) (quoting *United States v. Fletcher*, 62 M.J. 175, 178 (C.A.A.F. 2005)). Such conduct "can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, [for example] a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *Andrews*, 77 M.J. at 402 (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)). "[T]rial counsel may 'argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence.'" *United States v. Halpin*, 71 M.J. 477, 479 (C.A.A.F. 2013) (quoting *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000)). "A prosecutorial comment must be examined in light of its context within the entire court-martial." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citation omitted).

Relief for improper argument will be granted only if the trial counsel's misconduct "actually impacted on a substantial right of an accused (i.e., resulted in prejudice)." *Fletcher*, 62 M.J. at 178 (quoting *Meek*, 44 M.J. at 5). We assess prejudice by considering whether the trial counsel's comments were so damaging that we cannot be confident the appellant was convicted or sentenced, as applicable, on the basis of the evidence alone. *See Halpin*, 71 M.J. at 480; *Fletcher*, 62 M.J. at 184. In assessing prejudice from improper argument, we balance three factors: (1) the severity of the misconduct; (2) the measures, if any, adopted to cure the misconduct; and (3) the weight of the evidence supporting the conviction or sentence, as applicable. *See Halpin*, 71 M.J. at 480; *Fletcher*, 62 M.J. at 184. "[T]he lack of a defense objection is 'some measure of the minimal impact of a prosecutor's improper comment.'" *Gilley*, 56 M.J. at 123 (additional internal quotation marks omitted) (quoting *United States v. Carpenter*, 51 M.J. 393, 396 (C.A.A.F. 1999)).

### 3. Analysis

#### a. Findings Argument

Appellant's contentions that trial counsel's findings argument was improper may be divided into three general categories: (1) trial counsel referring to Appellant as a "liar" and to Appellant having told "lies;" (2) trial counsel referring to the former USAFA cadets who testified for the Defense as "bros" and otherwise disparaging them; and (3) trial counsel suggesting the court

members' verdict would affect the ability of other alleged victims of sexual assault at the USAFA to "get justice." We address each category in turn.

### i. "Liar" and "Lies"

Trial counsel referring to an accused as a "liar" may constitute improper argument. *See Voorhees*, 79 M.J. at 11 (citing *Andrews*, 77 M.J. at 402); *Fletcher*, 62 M.J. at 182 (citation omitted). However, as noted above, the military judge sustained a defense objection on the second occasion and instructed the court members to disregard trial counsel's references to Appellant being a "liar." Court members are presumed to follow the military judge's instructions absent evidence to the contrary. *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000). Accordingly, we presume Appellant was not unfairly prejudiced by trial counsel's use of the word "liar."

As for trial counsel's subsequent references to Appellant having told "lies," the Defense did not object and we find no clear or obvious error. These references to evidence that Appellant had lied to investigators and made inconsistent statements in his testimony constituted an evidence-based argument regarding the credibility of Appellant's testimony, a question properly before the court members. Although perhaps a fine line, such argument may be distinguished from disparaging Appellant's character by referring to him as a "liar." That the trial participants perceived such a distinction explains why trial defense counsel did not continue to object and why the military judge did not further intervene.

Even if we had found trial counsel's continued references to Appellant having lied were plainly erroneous, having considered the three-factor test articulated in *Fletcher*, we further conclude such an error did not materially prejudice Appellant's substantial rights. In particular, we find the severity of such an error to be slight, as trial counsel was essentially drawing attention to evidence the court members had properly received. The military judge's instruction that the court members were to disregard the label of "liar" and bore the responsibility to weigh evidence and determine credibility further mitigated any risk of improper influence on the court members' deliberations.

### ii. Reference to Defense Witnesses

Appellant asserts trial counsel's reference to the former cadets—now-current Air Force officers—who testified as defense witnesses as "bros" was derogatory. However, the Defense did not object at trial, and we find no clear or obvious error. We are not persuaded the term is inherently derogatory. Moreover, the term was not entirely invented by trial counsel; Appellant and another defense witness both used the term "bro code" in their testimony. Whether trial counsel's decision to use the term was a wise or effective tactic

is a distinct question, but we do not find using the term "bro" in this context was clearly or obviously improper.

Trial counsel's suggestion that the "bro code," or loyalty among Appellant and his friends, might have the effect of "silencing" KP as an alleged victim of sexual assault was potentially more volatile. However, we do not find it so inflammatory as to constitute plain or obvious error in this case. The testimony and other evidence before the court members clearly suggested that some of the former cadets who testified sympathized with KP while others sympathized with Appellant. In such circumstances, we do not find it is necessarily improper for trial counsel to comment on how such sympathies, friendships, or other influences may affect witness testimony, and how the court members should evaluate it. Similarly, with regard to KP's testimony in particular, it was not necessarily improper to suggest her persistence in reporting and testifying to the alleged offense—in spite of the social support her alleged assailant enjoyed—weighed in favor of KP's credibility. We do not decide whether trial counsel's arguably provocative statement that the "bro code" might "silence" KP was objectionable; we merely hold that, in the absence of an objection, the military judge did not plainly or obviously err by declining to intervene *sua sponte*.

### *iii. Reference to Other Alleged Victims of Sexual Assault*

In contrast, we find trial counsel's suggestion that the court members' verdict had the potential to "make it impossible for female cadets like [KP] to get justice" was clearly error. Trial counsel is prohibited from arguing irrelevant matters. *United States v. Tyler*, 81 M.J. 108, 111 (C.A.A.F. 2021) (quoting *United States v. Schroder*, 65 M.J. 49, 58 (C.A.A.F. 2007)). In deliberating on findings, the court members' task was to determine whether the evidence admitted in that court-martial proved Appellant's guilt beyond a reasonable doubt. How their verdict might affect other cases was speculative, irrelevant, and not an appropriate consideration.

However, having again applied the three-factor *Fletcher* test, we find Appellant has not met his burden to demonstrate material prejudice to his substantial rights. Beginning with the strength of the evidence, as described above we find the evidence supporting Appellant's conviction for assault consummated by battery by biting KP was moderately strong. Evidence of the bite itself was quite strong, with KP's testimony reinforced by photographs and the nurse examiner's testimony that the circular bruising was consistent with a human bite. Whether the bite was consensual, or reasonably believed by Appellant to be consensual, was hotly contested, but the court members had good cause to find KP's testimony more credible than Appellant's in that respect. As for the second factor, the military judge did not take any specific corrective action in the absence of an objection. Finally, and most importantly, we find

the severity of the misconduct to be low. The comment in question constituted a fraction of one sentence in a lengthy findings argument that focused primarily on the evidence in the case. The absence of an objection is itself some measure of the lack of prejudicial impact. *See Gilley*, 56 M.J. at 123. Considering the factors together in the context of the entire court-martial, we conclude Appellant has not weakened our confidence that Appellant was convicted on the basis of the evidence alone. *See Fletcher*, 62 M.J. at 184.

### b. Sentencing Argument

Appellant also contends the portions of trial counsel's sentencing argument quoted above were improper, specifically the references to the cadet honor code and to the need to protect female cadets. We find no relief is warranted.

Trial defense counsel objected to trial counsel's reference to the cadet honor code. The military judge overruled the objection, analogizing references to the cadet honor code—which would be familiar to the court members who were stationed at the USAFA—during sentencing argument to references to the Air Force Core Values, which this court approved in *United States v. Gatewood*, 65 M.J. 724, 726 (A.F. Ct. Crim. App. 2007) (per curiam). In *Gatewood*, this court held "the Air Force Core Values are meant to be inspirational and aspirational, but are not interjected inappropriately as 'command policy' when referenced during the sentencing phase of a court-martial." *Id*. We do not find the military judge's analogy to be entirely apt. Whereas the Core Values of integrity, service before self, and excellence are indeed aspirational, the cadet honor code by contrast is decidedly more specific and prohibitive, and implies specific consequences for failure to meet the prescribed standard of behavior. Arguably, evidence that Appellant as a cadet failed to live up to the honor code (by lying) was a relevant sentencing consideration in that it further illuminated his rehabilitation potential, or lack thereof. On the other hand, it is also arguable that specifically invoking the honor code injects command policy as an influence of the court members' deliberation, potentially, for example, implying that Appellant's retention in the Air Force was not to be "tolerated" and that a dismissal was a particularly appropriate punishment.

However, we need not determine whether a trial counsel's comments were in fact improper if we determine that the error, if any, did not materially prejudice the Appellant's substantial rights. *See Halpin*, 71 M.J. at 479–80. Assuming for purposes of argument that the military judge erred, we find any such error did not unfairly prejudice Appellant. Once again turning to the *Fletcher* factors, first and most importantly we find the severity of the error to be low. Arguably, trial counsel's reference to the honor code was an appropriate sentencing consideration, as evidence that he lied to the AFOSI or during his testimony might bear on his rehabilitation potential. *See* R.C.M. 1001(a)(5); R.C.M. 1001(e). Furthermore, the military judge instructed the court members

Appellant was to be sentenced only for the offense for which he had been convicted, mitigating the risk that the court members might punish him for dishonesty or violating the code. We do find that the second factor weighs in Appellant's favor, as the military judge overruled the objection and indicated the argument was not improper. As to the third factor, for reasons described at greater length, *infra*, in relation to the severity of Appellant's punishment, we find the evidence supports Appellant's sentence to a dismissal alone, without confinement or other additional punishment. Viewed in the context of the entire case, we are not persuaded trial counsel's brief reference to the honor code was so damaging that Appellant was not sentenced on the basis of the evidence.

With regard to trial counsel's reference to the need to make female cadets feel safe, trial defense counsel interrupted with an objection that the military judge sustained. Although the military judge did not specifically instruct the court members to disregard trial counsel's comments, we note references to safety and general deterrence in sentencing arguments are not improper *per se*. *See* R.C.M. 1002(f)(3)(D); *United States v. Akbar*, 74 M.J. 364, 394 (C.A.A.F. 2015). Moreover, the military judge cut short this line of argument before it could assume problematic proportions. We find no error is this regard.

### E. Mendacity Instruction

#### 1. Additional Background

As described above, Appellant testified during trial on the merits. He generally described his encounter with KP in her dorm room on 8 June 2018 as consensual up to the point KP decided they should not proceed further, at which point he stopped. Appellant testified that he kissed and sucked on certain areas of KP's body, including the right side of her torso where Cadet GS, Cadet HF, and the nurse examiner CO later saw and photographed the bruise KP identified as a bite mark. Appellant did not specifically testify that he bit KP on her side; however, on cross-examination Appellant agreed that "in [his] first sexual encounter with [KP], she left with bite marks and bruises all over her body." At another point during cross-examination, Appellant agreed that his testimony at trial was inconsistent with his prior sworn testimony in a motion hearing regarding something KP and Cadet GS said at the bar on the night on 7–8 June 2018.

In discussing potential sentencing instructions with counsel, the military judge indicated he intended to provide the court members a standard instruction on mendacity with respect to Appellant's testimony. The Defense objected, arguing the court members' verdict did not necessarily imply they believed Appellant lied during his testimony. Trial defense counsel contended Appellant did not deny he bit KP, and the court members might have concluded Appellant had an honest but unreasonable belief that KP consented to the bite that failed

to satisfy the criteria for a mistake of fact defense. Trial defense counsel recognized the draft instruction was "conditional in its language," and did not affirmatively indicate Appellant had testified falsely; nevertheless, the Defense objected on the grounds the instruction had not been raised by the evidence. Trial counsel argued in favor of the instruction, pointing to Appellant's direct examination testimony that the mark on KP's side was a "consensual hickey."

The military judge overruled the Defense's objection, finding the evidence reasonably raised the issue of mendacity. He subsequently instructed the court members accordingly:

> In considering the rehabilitative potential of the accused in this case you may also consider the issue of what the law refers to as "mendacity." Specifically, if you believe the evidence raised the question of whether the accused testified falsely before this court under oath at trial, consider this: no person, including the accused, has a right to seek to alter or affect the outcome of a court-martial by false testimony. You are instructed that you may consider this issue only within certain constraints.

> First, this factor should play no role whatsoever in your determination of an appropriate sentence unless you conclude that the accused did lie under oath to the court-martial.

> Second, such lies must have been, in your view, willful and material, meaning important, before they can be considered in your deliberations.

> And, finally, you may consider this factor insofar as you conclude that it, along with all of the other circumstances in the case, bears upon the likelihood that the accused can be rehabilitated. You may not mete out additional punishment for the false testimony itself.

### 2. Law

"We review a military judge's decision to give a sentencing instruction for an abuse of discretion." *United States v. Barrier*, 61 M.J. 482, 485 (C.A.A.F. 2005) (citation omitted). "In this context, a military judge abuses his discretion when the instructions are based on an erroneous view of the law or are not tailored to the case's facts and circumstances." *United States v. Talkington*, 73 M.J. 212, 215 (C.A.A.F. 2014) (citations omitted).

"[A]n appellant's mendacity may be considered in sentencing, subject to certain limitations." *United States v. Jenkins*, 54 M.J. 12, 19 (C.A.A.F. 2000) (citing *United States v. Warren*, 13 M.J. 278 (C.M.A. 1982)). The CAAF has explained:

> [T]he military judge must instruct the members that they may not consider trial counsel's mendacity argument "unless they conclude that the accused *did* lie under oath to the court" and that "such lies must have been, in [the members'] mind, 'willful and material.'" Finally, the members may consider an accused's mendacity "only insofar as they conclude that it, along with all the other circumstances in the case, bears upon the likelihood that the accused can be rehabilitated." The court members "may not mete out additional punishment for the false testimony itself."

*Id.* at 19–20 (second alteration in original) (quoting *Warren*, 13 M.J. at 285–86).

### 3. Analysis

On appeal, Appellant again contends the evidence did not reasonably raise the issue of Appellant's mendacity during his trial testimony. We disagree. That the verdict did not necessarily imply the court members found Appellant testified falsely under oath did not render the mendacity instruction inapplicable. The verdict, in light of Appellant's testimony, certainly raised the prospect that the court members may have found Appellant lied while testifying. The military judge's instruction was appropriately conditional. Court members are presumed to follow the military judge's instructions, *Taylor*, 53 M.J. at 198, and consequently we presume the instruction had no effect on the members' deliberations unless they first reached the requisite conclusion that Appellant did, in fact, lie.

Appellant highlights the following directive from *Warren*: "When trial counsel does choose to urge in his sentence argument that an accused's alleged lying to the court is a factor to be considered as to his rehabilitative potential, the military judge should appropriately instruct the court *upon request of the accused*." 13 M.J. at 286 (emphasis added). We recognize the mendacity instruction arose from *Warren* out of an intent to avoid unfair prejudice to the accused, with the understanding that trial counsel would henceforth be permitted to argue "the accused's perjury for sentencing purposes." *Id.* at 285. However, in *Warren* itself our superior court clarified that a military judge may provide a mendacity instruction even in the absence of a defense request. *Id.* at 285 n.9.

As for the substance of the instruction the military judge provided, it met each of the criteria set forth by our superior court. Appellant does not contend otherwise.

Accordingly, we find the military judge did not abuse his discretion by providing the mendacity instruction.

**F. Collateral Consequence Instruction**

**1. Additional Background**

During presentencing proceedings Appellant provided a written unsworn statement which, *inter alia*, asserted the following:

> I allowed myself to be in a position of question and I know that my continued service will not be allowed. Whether by administrative discharge or by dismissal as part of the sentence in this court-martial, the end of my service as a result of my actions will incur an approximately $200,000[.00] debt to the Air Force for my education.

Relying on *Talkington*, 73 M.J. at 216, the Government requested the military judge instruct the court members that Appellant's possible educational debt was a collateral consequence of his conviction that should not be part of their deliberations on an appropriate sentence. Trial defense counsel opposed such an instruction "in principle," but acknowledged *Talkington*, "underst[oo]d that the court will give the instruction," and had "no issue" with the proposed wording of the draft instruction.

In response, the military judge commented that he "agree[d]" with the Defense to the extent that he was "confused by precedent that says on the one hand the accused has an opportunity to allocute to this; on the other hand, as collateral consequence, the members can be instructed to disregard. That is the state of the law that CAAF has left us, though." Accordingly, the military judge indicated he would give the requested instruction. He subsequently included the following in his sentencing instructions:

> The accused's unsworn statement included [Appellant's] personal opinions about the meaning of his conviction at this court-martial. An unsworn statement is a proper means to bring information to your attention, and, as I've said, must be given appropriate consideration. However, your deliberations should focus on an appropriate sentence for the accused for the offense of which [Appellant] stands convicted.
>
> It is not your duty to anticipate discretionary actions that may, or may not, be taken by [Appellant's] chain of command or other authorities. It is not your duty to attempt to predict the consequences of his conviction at this court-martial, including any administrative discharge, monetary recoupment, or consequences thereof.
>
> While the accused is permitted to address these matters in an unsworn statement, these possible collateral consequences or

potential administrative actions should not be part of your deliberations in arriving at a sentence. Your duty is to adjudge an appropriate sentence for the accused based upon the offense for which the accused has been found guilty that you regard as fair and just when it is imposed, and not one whose fairness depends upon actions that others may take, or not take, in this case or possible requirements of educational debt or administrative discharge in the future.

**2. Law**

The military judge's decision to give a sentencing instruction is reviewed for an abuse of discretion. *Barrier*, 61 M.J. at 485 (citation omitted).

In *Talkington*, the CAAF explained:

A collateral consequence is "'[a] penalty for committing a crime, in addition to the penalties included in the criminal sentence.'" *United States v. Miller*, 63 M.J. 452, 457 (C.A.A.F. 2006) (alteration in original) (quoting BLACK'S LAW DICTIONARY 278 (8th ed. 2004) (citing as 1999 in original)), *overruled in part by United States v. Riley*, 72 M.J. 115, 120–21 (C.A.A.F. 2013). "The general rule concerning collateral consequences is that 'courts-martial [are] to concern themselves with the appropriateness of a particular sentence for an accused and his offense, without regard to the collateral administrative effects of the penalty under consideration.'" *United States v. Griffin*, 25 M.J. 423, 424 (C.M.A. 1988) (alteration in original) (quoting *United States v. Quesinberry*, [ ] 31 C.M.R. 195, 198 ([C.M.A.] 1962)). The collateral consequences of a court-martial do not constitute R.C.M. 1001 material, and while they may be referenced in an unsworn statement, [ ] they should not be considered for sentencing. *United States v. McNutt*, 62 M.J. 16, 19–20 (C.A.A.F. 2005).

73 M.J. at 215–16 (additional citations omitted); *see also United States v. Cueto*, 82 M.J. 323, 327–29 (C.A.A.F. 2022) (relying on *Talkington*). A military judge has broad discretion to provide instructions regarding collateral consequences, provided those instructions are legally correct and tailored to the facts and circumstances of the case. *Talkington*, 73 M.J. at 217 (citing *United States v. Duncan*, 53 M.J. 494, 499 (C.A.A.F. 2000)).

**3. Analysis**

Appellant contends the military judge abused his discretion by providing the limiting instruction regarding Appellant's potential debt to the Air Force. On appeal, he provides a more specific objection than the Defense offered at trial. Appellant notes that in *Talkington* the CAAF distinguished sex offender

registration requirements, which were at issue in that case, from the loss of military retirement benefits. *Id*. at 216–17. The CAAF explained:

> [S]ex offender registration is markedly different than retirement benefits, which can directly be affected by the imposition of a punitive discharge -- loss of military retirement benefits is one possible result of the sentence itself, as opposed to the conviction. . . . Thus, unlike the loss of retirement benefits, which would be a direct consequence of the imposition of a punitive discharge, there is no causal relation between the sentence imposed and the sex offender registration requirement. Whether Appellant received no punishment or the maximum available punishment he would be required to register as a sex offender based on the fact of his conviction alone.

*Id*. at 217 (citations omitted); *see also United States v. Easterly*, 79 M.J. 325, 327 n.2 (C.A.A.F. 2020) (citation omitted) ("This Court has long recognized that the impact of a punitive discharge on retirement benefits where a member is 'perilously close to retirement,' . . . is not collateral, but rather 'a direct and proximate consequence of the sentence.'"). Appellant reasons that like the loss of retirement benefits, and in contrast to sex offender registration, his potential educational debt was not a true collateral consequence of his *conviction* because it was dependent on the possible *sentence*—specifically, on whether the sentence included a punitive discharge.

For several reasons, we are not persuaded the military judge erred.

As an initial matter, we note the incongruity of Appellant's assertions in his unsworn statement and his position on appeal. In his unsworn statement, Appellant represented that as a result of his conviction his "continued service will not be allowed," and "the end of [his] service as a result of my actions will incur an approximately $200,000[.00] debt to the Air Force." In other words, Appellant essentially represented that the debt was an inevitable consequence of his conviction—presumably in order to emphasize the hardship he was already facing regardless of any punishment imposed by the court-martial. In contrast, as noted above, on appeal Appellant relies on the argument that educational recoupment was not a consequence of his conviction, but a potential consequence of the sentence, specifically a potential dismissal.

More significantly, whereas the CAAF has recognized the significance of potential retirement benefits for an accused servicemember who is "perilously close to retirement," *United States v. Greaves*, 46 M.J. 133, 139 (C.A.A.F. 1997), Appellant has not drawn our attention to any appellate opinion holding that recoupment of educational debt is not a collateral consequence. Indeed, the Government notes that this court recently held the possibility that an

appellant "might later be required to repay the cost of his Air Force Academy tuition" was a "collateral matter[ ]." *United States v. Walton*, No. ACM 39664, 2020 CCA LEXIS 365, at *10 (A.F. Ct. Crim. App. 15 Oct. 2020) (unpub. op.); *cf. United States v. Perry*, 48 M.J. 197, 199 (C.A.A.F. 1998) (holding military judge did not abuse his discretion by declining to give a defense-requested instruction that a dismissal might require appellant to reimburse the cost of his U.S. Naval Academy education); *United States v. Yebba*, No. ACM S32519, 2019 CCA LEXIS 338, at *10–12 (A.F. Ct. Crim. App. 23 Aug. 2019) (unpub. op.) (holding appellant's $203,866.93 debt to the Air Force for overpayment was a collateral consequence of his conviction).

In addition, as the Government also notes, recoupment of service academy debt is not necessarily an inevitable consequence of a cadet receiving a punitive discharge. *See* Department of Defense Instruction 1322.22, *Service Academies*, Enclosure 3, ¶ 6.f.(6) (24 Sep. 2015) (providing service secretaries discretion in appropriate circumstances to waive reimbursement of academy educational costs for failure to enter active duty). The CAAF addressed a distinct but comparable situation in its recent opinion in *Cueto*, 82 M.J. at 330–31. There, as part of a claim of ineffective assistance of counsel, the appellant contended that by regulation as a result of his conviction for a sex offense the Air Force would initiate an administrative discharge if he did not receive a punitive discharge from the court-martial. *Id.* However, the CAAF rejected the appellant's contention that such a discharge would be "mandatory," noting the possibility that the appellant could seek a waiver, however unlikely. *Id.* at 331. The CAAF explained, "[w]e think that this makes administrative discharges different from the loss of retirement benefits." *Id.* Similarly, given the existence of discretionary authority to grant an exception to the usual policy, in this respect we consider the recoupment of educational debt more analogous to a potential administrative discharge resulting from conviction for a sexual offense than to a near-retirement-eligible servicemember's loss of anticipated retirement benefits resulting from a punitive discharge.

Accordingly, we conclude the military judge did not abuse his broad discretion by instructing the court members that Appellant's potential educational debt to the Air Force, like his potential administrative discharge, was a collateral consequence of his court-martial and should not be part of their deliberations on an appropriate sentence for the offense.

## G. Sentence Severity

### 1. Law

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). We may affirm only as much of the sentence as we find

correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d), UCMJ, 10 U.S.C. § 866(d). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense, the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (citing *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009)). Although the Courts of Criminal Appeals are empowered to "do justice[ ] with reference to some legal standard," they are not authorized to grant mercy. *United States v. Guinn*, 81 M.J. 195, 203 (C.A.A.F. 2021) (quoting *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010)).

### 2. Analysis

Appellant contends his sentence to a dismissal is inappropriately severe. He characterizes the dismissal as the "worst punishment available" at his court-martial; he refers to favorable character statements from 15 individuals; and he cites his perseverance in starting his own small business while awaiting trial after graduating from the USAFA as demonstrating strong rehabilitative potential.

We are not persuaded. The court members found Appellant guilty of unlawfully doing bodily harm to KP by biting her on the torso hard enough to leave a distinctive bruise plainly visible two days later. Moreover, as described above, to the extent the court members found Appellant testified falsely under oath, they could consider that circumstance for its bearing on Appellant's rehabilitation potential. In addition, the military judge instructed the court members they could consider evidence that Appellant lied repeatedly during his AFOSI interview as rebuttal to positive character evidence presented by the Defense. Appellant faced a maximum punishment that included confinement for six months as well as total forfeiture of pay and allowances in addition to the dismissal. However, he was adjudged no confinement at all. Having given individualized consideration to Appellant, the nature and seriousness of the offense, Appellant's record of service, and all other matters contained in the record of trial, we conclude Appellant's dismissal was not an inappropriately severe punishment for his offense.

## H. Post-Trial and Appellate Delay

### 1. Additional Background

Appellant was sentenced on 16 October 2020. The convening authority issued his decision on action and approved the sentence on 10 November 2020, and the military judge entered the judgment of the court-martial on 19 November 2020. However, although the court reporter certified the record of trial on 11 December 2020, the court reporter did not certify the transcript of the

recorded proceedings until 9 March 2021. The record of trial, including the transcription, was docketed with this court on 15 April 2021, 181 days after sentencing.

Appellant submitted his assignments of error to this court on 11 July 2022 after obtaining 12 enlargements of time over the Government's objection. The Government submitted its answer on 6 September 2022. Appellant submitted his reply brief on 22 September 2022, after obtaining an unopposed additional four-day enlargement of time.

Although not identified by the parties, during its review this court noted the record was incomplete in that the audio recordings of seven days of Appellant's court-martial proceedings were not included as required by R.C.M. 1112(b). On 6 October 2022 this court issued an order to the Government to show good cause as to why the court should not return the record for correction pursuant to R.C.M. 1112(d). The Government responded on 19 October 2022. On 25 October 2022, this court returned the record to the military judge for correction. *United States v. Brown*, No. ACM 40066, 2022 CCA LEXIS 625, at *2 (A.F. Ct. Crim. App. 25 Oct. 2022) (order). The military judge executed a certificate of correction on 10 November 2022, and the record was redocketed with this court on 15 November 2022. On 5 December 2022, Appellant's counsel filed a brief indicating Appellant did not raise any additional assignments of error arising from the remand or correction of the record.

### 2. Law and Analysis

In *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006), the CAAF held that failure of the convening authority to take action on the sentence within 120 days of sentencing, the failure to docket the record of trial with the Court of Criminal Appeals within 30 days of convening authority action, and the failure of a Court of Criminal Appeals to issue an opinion within 18 months of docketing all constituted facially unreasonable delay for purposes of an appellant's due process rights to timely post-trial and appellate review. The CAAF held such a delay triggered an analysis of the four factors enumerated in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), to determine if the appellant was entitled to relief. *Moreno*, 63 M.J. at 142. The CAAF created these specific thresholds for facially unreasonable delay in light of the post-trial processing requirements in effect for cases referred to trial by court-martial prior to 1 January 2019. In *United States v. Livak*, this court adapted the *Moreno* standards to the post-1 January 2019 post-trial procedures by consolidating the 120-day and 30-day standards into a single standard whereby we presume a facially unreasonable delay when the record of trial is not docketed with the

Court of Criminal Appeals within 150 days of sentencing. 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020).[15]

Accordingly, although not raised by Appellant, the 181 days that elapsed between Appellant's sentencing and docketing with this court constituted a facially unreasonable post-trial delay. In addition, the amount of time that elapsed following the initial docketing date of 15 April 2021 with this court is also facially unreasonable under *Moreno*. Accordingly, we have assessed the four *Barker* factors: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted). The CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations omitted). "No single [*Barker*] factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533). However, where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). We review de novo an appellant's entitlement to relief for post-trial delay. *Livak*, 80 M.J. at 633 (citing *Moreno*, 63 M.J. at 135).

---

[15] We recognize that certain developments might arguably call into question the continued vitality of *Moreno* under the current post-trial processing regime. First, action by the convening authority—a pivotal event in the *Moreno* analysis—no longer holds the same place in the post-trial process. *See Livak*, 80 M.J. at 633 (quoting *United States v. Moody-Neukom*, No. ACM S32594, 2019 CCA LEXIS 521, at *5 (A.F. Ct. Crim. App. 16 Dec. 2019) (unpub. op.) (per curiam)). Second, the post-2019 version of Article 66(d)(2), UCMJ, 10 U.S.C. § 866(d)(2), now specifically addresses post-trial delay, stating a Court of Criminal Appeals "may provide appropriate relief if the accused demonstrates error or excessive delay in the processing of the court-martial after the judgment was entered into the record," thereby arguably stepping into a portion of the field to which the CAAF sought to bring order in *Moreno*. However, the CAAF has not reversed or revisited *Moreno*, and we remain bound by our superior court's precedent. *See United States v. Andrews*, 77 M.J. 393, 399 (C.A.A.F. 2018) (citation omitted); *cf. Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

In this case, Appellant has not asserted cognizable prejudice from the post-trial or appellate delay, and we perceive none. Appellant was not sentenced to confinement and therefore has not suffered oppressive incarceration; he has not identified any particularized anxiety or concern due to the delay; he has not identified any way in which his ability to appeal his conviction and sentence has been prejudiced; and this court affirms the findings and sentence without authorizing a rehearing. Moreover, in light of the size of the record in this case and the reasons for the post-trial and appellate delays, these delays did not impugn the fairness or integrity of the military justice system. Appellant's court-martial spanned a total of 13 days, involved four different court reporters, and generated a record of 15 volumes and over 2,600 transcript pages. In addition, the appellate delay was primarily attributable to enlargements of time requested by Appellant himself. Accordingly, we find no violation of Appellant's due process rights.

Finally, recognizing our authority under Article 66(d), UCMJ, we have also considered whether relief for excessive post-trial or appellate delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude no such relief is warranted.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court